## Commonwealth *v.* Ellis, Appellant (No. 1).

*Criminal law—Food law—Bad eggs—Sale of eggs—Act of March 11, 1909, P. L. 13—Custom—Constitutional law.*

1. A person may be convicted under the Act of March 11, 1909, P. L. 13, for selling "eggs that are unfit for food" by proof that he sold a quantity of eggs with an understanding with the purchaser that the latter might receive back a certain portion of the purchase money if some of the eggs proved bad, but without any obligation of the purchaser to return the bad eggs.

2. If certain facts, which in law constitute a sale, are testified to by the defendant himself, the judge does not invade the province of the jury by instructing them that the transaction was a sale. For the province of the judge is not merely to counsel, but to instruct, and it is the duty of the jury to take his instructions as the best evidence of the law.

*Custom—Statute—Repugnancy.*

3. A custom or usage repugnant to the express provisions of a statute is void, and whenever there is a conflict between a custom or usage and a statutory regulation the statutory regulation must control.

*Public officers—Agent of pure food department—Authority—Act of March 11, 1909, P. L. 13.*

4. An agent of the pure food department cannot abrogate the plain provisions of the Act of March 11, 1909, P. L. 13.

*Constitutional law—Title of act—Pure food law—Act of March 11, 1909, P. L. 13.*

5. The Act of March 11, 1909, P. L. 13, is sufficient in title and not unconstitutional.

Argued Dec. 9, 1910.   Appeal, No. 254, March T., 1911, by defendants, from judgment of Q. S. Phila. Co., May Sessions, 1910, No. 566, on verdict of guilty in case of Commonwealth v. George W. Ellis.   Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ.   Affirmed.

Indictment for selling eggs unfit for food.   Before BARRATT, J.

At the trial under objection and exception the court

rejected an offer of the rules of Philadelphia Produce Exchange with reference to the classification of eggs and for the purpose of showing the custom of the trade as to the sale of eggs in crates. [4]

The court also rejected under objection and exception the result of a conference between an agent of the Pure Food Department and the Produce Exchange to the effect that if crated eggs were stamped with the words "original cases not candled, no charge nor allowance for bad eggs," there would be no objection by the department. [6]

Defendant also made the following offer:

Mr. Conard: I propose to prove by three other witnesses the custom and use of the trade of wholesale egg dealers in the city of Philadelphia, to receive eggs in crates without candling them, and to sell them in such crates uncandled, the price being fixed by the purchaser and buyer on the basis of an estimate of the number of good eggs in the crates and the number which will be found to be spoiled, with the understanding that the spoiled eggs in the crates are not sold, but that the charge is made only for the eggs that are good; and further, that in cases where the estimate of grade of the eggs is found after actual test by the purchaser to be too low, and the amount of losses he has incurred is determined, an allowance is made by the seller for the overplus of spoiled eggs, and that this is done because of the necessities of the business as it exists.

Mr. Maurer: The commonwealth objects to this offer, first, because it is entirely irrelevant to the issue; secondly, a seller cannot shift the responsibility of complying with the law by placing it upon the purchaser, and thirdly, no matter what the knowledge or intention was, under the act of assembly it is unlawful for anybody to sell any eggs to anybody for food purposes that are unfit for food.

Objection sustained; exception to defendants. [7]

The court charged in part as follows:
[The defendants admit that these eggs were sold by them

on the dates and in the quantities as set out by the commonwealth.] [8]

[Now, the defense that is attempted to be set up is that these crates of eggs were sold with the implied understanding that when the purchaser examined them after purchase, if he found rotten eggs, or eggs unfit for food, among them, he could come back to the defendants and have his money returned to him in such an amount as represented the value of the unfit eggs.  The defendants tell you that in this way they made the matter right or satisfactory to their purchasers; but I instruct you that this method did not make the matter satisfactory to the law.  Under the law they did an unlawful thing when they offered for sale, exposed for sale, and did sell eggs that were unfit for food.  It is no defense to the act of assembly to come into court and say, Yes, I did sell these crates of eggs which I knew contained bad eggs, but I sold them at less than the market price for good eggs, and in addition to that, was willing to make good to the purchaser for the bad eggs that he might discover in the crates purchased by him.  That is no defense at all.  The law says explicitly that such eggs must not be sold, and that if they are, the sale is unlawful.  Therefore the only defense that would avail these defendants would be that the eggs which they sold did not contain eggs unfit for food, as alleged by the commonwealth.] [9]

Verdict of guilty, upon which the defendant was sentenced to pay a fine of $500 and undergo an imprisonment for three months.

*Errors assigned* were (4, 6, 7) rulings on evidence, quoting the bill of exceptions; (8, 9) above instructions, quoting them.

*C. Wilfred Conard* and *J. H. Shoemaker*, for appellants, cited: Kane v. Com., 89 Pa. 522; Com. v. McManus, 143 Pa. 64.

*John H. Maurer*, assistant district attorney, with him

*Samuel P. Rotan*, district attorney, for appellee, cited: Com. v. Seiler, 20 Pa. Superior Ct. 260; Theel v. Com., 22 W. N. C. 58; Com. v. Leslie, 20 Pa. Superior Ct. 529.

OPINION BY RICE, P. J., March 3, 1911:

The indictment under which the defendant was convicted was drawn under the Act of March 11, 1909, P. L. 13, which makes it "unlawful for any person . . . . to sell, offer for sale, expose for sale, or have in possession with intent to sell, eggs that are unfit for food, within the meaning of this act." The defendant was a wholesale dealer in eggs, and Harry Saylor, to whom it was alleged the defendant made the unlawful sale, was also a dealer. The testimony of Saylor was to the effect that he applied to the defendant to buy good eggs, and the latter delivered to him five and one-half crates, for which he paid at a certain price per crate, $33.00; that he took them to his place of business and immediately candled one crate, containing thirty dozen, and found that about seven or eight dozen were good and the rest were bad, being what are called "rots" and "spots." On the following day, according to his testimony, he complained to the defendant that the eggs were bad and said that he would bring them back, and that the defendant gave him $6.00 and told him not to bring them back, but to sell them cheaper. Saylor sold them for about half price to a baker. This fact does not affect the question of the defendant's guilt or innocence, but it is significant as showing the practices which the statute was evidently intended to break up. The witness also testified to another sale of two crates, containing sixty dozen, of which a large proportion were unfit for food. The principal contention of the defendant is that, under the evidence adduced by him, the jury could have found that there was no sale of the bad eggs, but only of the good eggs, and therefore it was error to charge the jury that the defendants admitted that these eggs were sold by them on the dates and in the quantities set out by the commonwealth. This contention will be best answered

by quoting the material portions of the testimony. The defendant described the first transaction in this way: "Mr. Saylor came in and wanted to know whether we had any eggs for sale. I don't know whether he asked for any particular kind. Sometimes they ask for dirty eggs or cheap eggs. He came in and bought the eggs and looked at them and we sold them to him for $5.50 a box. The eggs were opened and examined in our store. He was satisfied, being a dealer in eggs, and he knows what a rotten egg is, and a spot egg—examined them himself and was satisfied to take them." Speaking of the second transaction, he testified as follows: "He came in there. There were sixteen cases, if I remember rightly, in the lot, and he says—or we asked—I just forget now—it was more than he bought; I remember that. He paid $5.25 a case, which was seventeen and a half cents a dozen. We probably asked him nineteen or twenty cents for them and he examined the eggs and we agreed on a price and he said, I will buy these two cases and take them home and candle them, and if they suit me I will come back and take the balance at the same price. We told him all right. He examined the eggs partly in the store and then he said he would take them down and examine the two crates thoroughly and see if they suited him, and then if they suited him—the loss wasn't too heavy—he would purchase the balance of them." Thomas T. Ellis, a codefendant, testified regarding the first transaction as follows: "Well, Mr. Saylor came in. He inquired whether we had any cheap eggs. My son says, 'There is six crates there of not very high-priced eggs.' And he inquired the price of them, and they gave him the price of them and told him to examine them, and every one of those six crates were examined by Mr. Saylor. . . . Mr. Saylor paid for the eggs and took them away. Next morning, or the next day at least, he came into the store, he did, quite excited, saying that he had paid too much for them, they wasn't as good as he expected after he examined them, and he wanted his money back. So the agreement was to settle it with

Mr. Saylor, that we didn't want him to lose any money on the eggs—we don't want anybody to, we don't do business in that shape, and so we settled—an agreement to settle in this way—in giving him—I don't know whether it was five or six dollars back." A perusal of this testimony leaves no room for doubt that the title to the entire contents of the crates, the good eggs as well as the eggs that were unfit for food, passed to the purchaser. It is true there is another portion of the testimony from which, it is argued, the jury might have inferred that the parties dealt upon the supposition that there were some bad eggs in each crate, that in fixing the price per crate this probability was taken into account, and that the implied understanding was that, if after candling them the purchaser found there was a greater proportion of bad eggs than had been supposed, he would be entitled to a return of a proportionate part of the price he had paid. The testimony does not show very clearly that he would have been entitled, as a matter of right, to demand such return. But let it be assumed that he had the right, that would not deprive the original transaction of any element of an executed sale. Even in that view of the bargain all of the eggs became the absolute property of the purchaser immediately upon delivery and payment of the stipulated price. The purchaser, even though he was entitled to a return of part of the price, was under no obligation to return the bad eggs in order to obtain it. He had a perfect right to retain those that were unfit for food, and to make such use of them as he could lawfully. As there was no view of the testimony adduced either on the part of the commonwealth or of the defendant, under which the jury could have found that the sale did not include the bad eggs as well as the good eggs, the learned judge committed no error in instructing them as he did, or in refusing the defendant's points. The law was well stated in the portion of the instructions contained in the ninth assignment of error. The defendant in a criminal case has no just cause to complain that the law applicable to the case is so clearly and posi-

tively stated that it cannot be misunderstood by the jury. If certain facts, which in law constitute a sale, are testified to by the defendant himself, the judge does not invade the province of the jury by instructing them that the transaction was a sale. For the province of the judge is not merely to counsel, but to instruct, and it is the duty of the jury to take his instructions as the best evidence of the law. This was conceded in Kane v. Commonwealth, 89 Pa. 522. It was more emphatically declared in Commonwealth v. McManus, 143 Pa. 64, and Commonwealth v. Goldberg, 4 Pa. Superior Ct. 142. And the general doctrine has been practically recognized and applied in many other cases.

With regard to the offers to prove the rules of the Philadelphia Produce Exchange, and the custom or usage of wholesale dealers in eggs in Philadelphia, we remark that if there is any local custom or usage under which such a transaction as is described in this case would not be a sale within the meaning of the act of assembly, it cannot be sustained as a valid custom. A custom or usage repugnant to the express provisions of a statute is void, and whenever there is a conflict between a custom or usage and a statutory regulation the statutory regulation must control: 12 Cyc. of Law and Procedure, 1054–6; Greene v. Tyler, 39 Pa. 361.

There are several objections to the offer to prove a general understanding that was reached at a conference between the agent of the pure food department and the produce exchange, relative to the manner of doing business by wholesalers which would not be objected to by the pure food department. It is needless to refer to these objections in detail, for one is so obvious that it needs no discussion, and that is that the officer of the commonwealth could not abrogate the plain provisions of the statute.

In the last assignment of error the constitutionality of the act is brought into question, the objection suggested being that the subject of the act is not clearly expressed

in its title. This assignment is not pressed in the printed brief of appellant's counsel, and, if it were, we think it could not be sustained. Under the circumstances we deem it unnecessary to discuss the question at length.

All of the assignments of error are overruled.

The judgment is affirmed, and the record is remitted to the court of quarter sessions of Philadelphia county, with direction that the judgment be fully carried into effect, and to that end it is ordered that the defendant forthwith appear in that court and that he be by that court committed to serve and comply with such part of his sentence as had not been performed at the time this appeal was made a supersedeas.