(135   35
143   94)

## COMMONWEALTH v. HENRY S. KNARR.

APPEAL BY DEFENDANT FROM THE COURT OF QUARTER SES
SIONS OF CLEARFIELD COUNTY.

Argued April 24, 1890—Decided May 12, 1890.
[To be reported.]

1. A lessee, permitted to hold over after the expiration of his term, is in no sense a trespasser while he continues in possession, but, on the con-trary, he has a clear legal right to remain upon the demised premises until he is notified to quit.

(a) In assigning a lease to Knarr, Geis stipulated that he should have the occupancy of a part of the premises, free of charge, until the lease ex-

Statement of Facts.

pired; and during the residue of the term, and for nine days thereafter, he occupied it apparently under Knarr.

(b) At the end of the assigned term, Geis unknown to Knarr received a new lease from the landlord. On his making it known, and asserting a claim thereunder, nine days later, Knarr ordered him to leave, and, on his refusal so to do, ejected him by force:

2 Upon these facts, Geis clearly did not have, as against Knarr, such possession as would sustain a verdict convicting Knarr of forcible detainer, his possession, such as it was, being merely by Knarr's permission, which the latter was not bound to continue.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS and MITCHELL, JJ.

No. 283 January Term 1890, Sup. Ct.; court below, No. 43 December Term 1889, Q. S.

On December 14, 1889, the grand jury returned as a true bill an indictment charging in substance that Henry S. Knarr, on October 9, 1889, did, with force and arms and with violence and a strong hand, unlawfully enter a certain hotel in DuBois, (describing it,) then and there in the peaceable possession of one Charles Geis, and him, the said Charles Geis, with force and arms and with a strong hand, by force and threats and menacing conduct did expel therefrom, and the said Charles Geis, so expelled, by force and with a strong hand and by menaces and threats did unlawfully hold and keep out, etc. The defendant pleaded not guilty.

At the trial on December 5, 1889, the following facts were shown:

Prior to July 28, 1889, Mrs. Annie Painter was the owner of the National Hotel in DuBois; but the furniture and fixtures therein were owned by Knarr, the defendant, and had cost him $8,000. The hotel was kept by or in the name of W. C. Quigley, a son-in-law of Mrs. Painter. On July 28, 1889, Mrs. Painter died, having appointed P. S. Weber her executor. On August 1, 1889, Weber, as executor, leased the hotel to W. C. Quigley and Charles Geis for two months. The lease was made verbally, but was evidenced by a receipt given for the rent expressly for that period. Quigley and Geis also leased the furniture and fixtures from Knarr for the same time, by a verbal lease.

On September 17, 1889, Quigley and Geis transferred their

lease of the hotel to Knarr by a written contract signed by parties, which was as follows:

"Agreement made this 17th day of September, 1889, Witnesseth, that W. C. Quigley and Charles Geis hereby sell, assign and set over to H. S. Knarr, all right, title and interest in our lease of the National Hotel, in DuBois, Pa., from this day to the 1st day of October, 1889, and that said H. S. Knarr shall have possession thereof at once, with all our rights and title. By permission of said H. S. Knarr, the said W. C. Quigley and Charles Geis are to run the hotel or boarding house part thereof, free of charge, to said October 1, 1889, but shall contract no bills on his account. The bar shall be under the sole and exclusive rental of said H. S. Knarr. The said H. S. Knarr agrees to pay said W. C. Quigley $175.00, and to pay the costs in No. 79 December Term 1889, and one half team hire and expense to be paid by Quigley and Knarr."

There was a parol understanding by the parties, as testified to by Quigley, that he and Geis were to have the hotel part of the house until October 1st, to enable them to get the boarding accounts which were due to them collected. On the date of the assignment the hotel license was transferred to Knarr by order of the court.

On September 18, 1889, Quigley sold to Geis all his interest in the hotel under the agreement with Knarr, and from that time until October 9, 1889, Geis had the exclusive management of all the hotel except the bar, hired and paid all the employees and servants, except the bar-tender, and took charge of the guests and received from them the pay for their boarding. He also received each evening from Knarr's bar-tender the receipts of the bar, and on the following morning paid the same over to Knarr. On the morning of October 9th, Geis paid over to Knarr the bar receipts of the preceding day.

The hotel was sold at public sale by Weber on October 8, 1889, to Scheutz, Renziehausen & Co., the terms of sale providing for the delivery of possession to the purchaser on November 1st. The day following the sale, Knarr went to the hotel for the purpose, as he testified, of ascertaining what arrangements the purchasers had made about the future control of the property. On that occasion he was informed by Geis, that Weber had given Geis a new lease of the hotel.

Statement of Facts.

That lease was dated September 30, 1889, but was in fact executed two days in advance of its date, on account of Weber's having occasion to leave home. By this lease Weber demised the hotel to Geis for one month from October 1st, with the privilege of renting from month to month thereafter, in case the person who might buy the property on October 8th should not desire to take charge of it on November 1, 1889. Testimony for the commonwealth tended to show that Weber, the executor, had given notice at the sale on the previous day, that the premises were leased to November 1, 1889, and that Knarr was present at the sale. Knarr testified, however, that his first knowledge of the lease was acquired in the conversation with Geis on the 9th; that he had received no notice to quit, and had never been informed that he was not regarded, after October 1st, as Weber's tenant. Upon hearing of this lease, on October 9th, Knarr at once asserted proprietorship of the hotel in himself, and ordered Geis to leave the house. A scuffle between them ensued. Geis then went out and returned with Weber. Knarr still asserted his claim to the control of the hotel, and indicated his intention to maintain possession of it. A second struggle occurred between him and Geis. Each party prosecuted the other for assault and battery. Finally Geis gave up the contest, leaving Knarr in possession.

Testimony for the commonwealth tended to show threats by Knarr that he would knock Geis's brains out, and demonstrations with a saw handle, about eighteen inches long and an inch and a half in diameter, with a piece of iron at the end of it. Geis testified that in one of his struggles with Knarr the latter bit him in the hand. The testimony of Knarr tended to rebut some of the statements of the commonwealth's witnesses respecting the use of violence by him. Portions of the testimony are more fully stated in the charge of the court below and the opinion of the Supreme Court, infra. Knarr remained in possession until November 30, 1889, on which day he consented to an award in favor of Weber in an action of ejectment brought by the latter to recover possession of the hotel, the award giving Knarr one week in which to remove his goods and fixtures.

At the close of the testimony the court, KREBS, P. J., charged the jury in part as follows:

Charge of Court below.

In order to convict this defendant of the crime of forcible entry, it is necessary that the jury should be satisfied beyond a reasonable doubt, from the evidence in the cause, that he took the possession, or entered into possession of the property, by force and violence, or circumstances of terror. Now, so far as the forcible entry in this case is concerned, I do not think the jury would be justified in finding this defendant guilty of forcible entry, because, from the evidence in this case on both sides, it would seem that there was no force, no violence, and no circumstances of terror accompanying his going into the house and placing himself in the position in which he was when he asserted his possession, and, it is claimed, turned the other party out of the possession. So that the question, as I view it, gentlemen of the jury, is, whether or not this defendant is guilty of the crime of forcible detainer. In other words, whether after entering peaceably, he by force, by threats, or by menacing conduct, turned the prosecutor, Charles Geis, out of possession. If he did, then gentlemen of the jury, it is your duty to say so by your verdict. . . . .

By a verbal agreement he (Weber) leased this property to Geis and Quigley, for two months, Quigley being there as the son-in-law of Mrs. Painter. It is not disputed here, and seems to be admitted, that Mr. Knarr was present when that arrangement was made, and had full knowledge of it; that he (Knarr) knew at the time this arrangement was made for the months of August and September, just what the arrangement was, as made by Mr. Weber as executor of the dead woman's estate, with the two parties, Quigley and Geis, who took possession under that lease. This lease is evidenced also by the receipt dated August 3, 1889, given by Mr. Weber to Quigley and Geis, for the rent, $200, being $100 per month, which receipt has been offered in evidence. So that if there was any dispute about the essential facts, they would be strongly corroborated by the receipt. Now at this time, if not fully admitted, it is not disputed by the defendant, that he had knowledge of what the terms of this arrangement was by which Geis and Quigley went into possession, and were to remain there during the two months, August and September, after which time it was supposed the property would be sold through the Orphans' Court.

On September 17, 1889, an agreement was entered into be-

tween Charles Geis, W. C. Quigley and H. S. Knarr.    This agreement was offered in evidence, and read in your hearing; but in order to put the construction upon it that in my judgment it is necessary to put upon it, that is, that is warranted by the language of the contract, I will read it. . . . . .

By that contract they only undertook to sell, assign and transfer their right, title and interest in the lease of the National Hotel of DuBois, Pa., from that day to October 1, 1889, and under that contract he had no rights of possession there after October 1, 1889, that he could have enforced against Quigley and Geis, and therefore could not have enforced it against Mr. Weber, unless Mr. Weber had made some arrangement with him by which a new arrangement was to be entered into.    So that on October 1, 1889, when the two months had expired, his rights there had terminated, so far as the possession of the hotel property was concerned. . . . . .

[The only right he had to the possession of the property was what he acquired under Quigley and Geis, and that was the arrangement that they, Quigley and Geis, had with Mr. Weber. Now, when the first day of October, 1889, expired, his duty under the law was to surrender that possession to Mr. Weber. It is true, Mr. Weber might permit him to hold over if he chose, but he did not choose to do that.] [1]    He, Weber, was responsible for the income from that property; he was bound under the law to see that it brought as much as any reasonable effort on his part would make it bring, not only for the heirs of the estate, but for the creditors of the estate.    It was his duty to get out of that property all he could, and as a prudent business man, he leased that property to Mr. Geis, and if Mr. Geis was not able to pay the rent of the property, then Mr. Weber was responsible to the heirs and creditors of the estate of Mrs. Painter. He made the lease, and he states that it was made about September 28th, and dated September 30th, because he was required to go to Philadelphia on business between the 28th and 30th, and could not be home on the 30th; therefore it was made two days before and dated September 30th, the day on which the other contract expired.    Now, gentlemen of the jury, there is nothing in that transaction that reflects upon Mr. Weber's conduct.    There is nothing there, so far as I can discover, that would authorize the jury to impose the costs upon him.    [Now,

Charge of Court below.

when the first day of October, 1889, came, the other contract expired, and Mr. Knarr's duty then was to deliver up possession to Mr. Weber, unless he went to Mr. Weber and made some arrangement, which he did not seem to choose to do.] [2] Mr. Geis, who made this arrangement with Mr. Weber, was entitled to the possession of the property as the representative of Mr. Weber, for the time that contract had to run, which was one month.

[There has been something said as to the custody and control of the bar. Now, gentlemen of the jury, I do not understand the law of Pennsylvania to be that one man in a hotel may run or own the bar, and another man may run the hotel or house. Certainly, when that license was transferred from Mr. Quigley to Mr. Knarr, it was not known that the possession of the house only had to run up until October 1, 1889, and even if it had, the arrangement between these parties as to the control of the bar after that, gave Mr. Knarr no right to the actual possession of the house. The arrangement under which he retained possession of the bar there, was one which was not recognized by the law; and, unless he contracted with Mr. Weber in regard to the possession of that house he had no right, in law, to withhold the possession from the estate that Mr. Weber represented, nor withhold it from the man to whom Mr. Weber had leased it.] [3]

Now, what are the facts in regard to the forcible detainer ? . . . . . The commonwealth alleges that Mr. Knarr came in there some time on October 9, 1889, probably between one and two o'clock, and in the absence of Mr. Geis, the prosecutor, went behind the hotel-office counter; not in the bar-room, but behind the bar of the counter in the office ; and, either sitting or standing, he was in that place when Mr. Geis, the prosecutor, came out from some other part of the house ; that when he went over to that part of the room and spoke to him, there arose this controversy between them. What the testimony on that point is you must endeavor to remember, as that is the material testimony in regard to the forcible detainer. The transaction alleged is, that when Mr. Knarr, the defendant, ordered Geis out of the house, or ordered him to give up possession, that the struggle began then and that Geis went out and had a warrant issued some time during the afternoon ; that there were two or

Arguments.

three struggles there, and that finally the defendant with a stick or club, called a crosscut-saw handle, doubtless you all know what that is,—said that he was going to maintain his possession, and did maintain actual possession or control of the house from that time forward. Now, if the possession was obtained peaceably, and maintained by Knarr, the defendant, by violence, by force, or by circumstances of terror, so that the prosecutor was kept out of the possession or usual use of that property, so that he had no control over it, then the defendant would be guilty, under this indictment, of forcible detainer, although he would not be guilty, under these facts or circumstances, of forcible entry.

Now, there is no serious controversy as to what occurred there on October 9, 1889, and if you are satisfied beyond a reasonable doubt that these acts were accompanied by such violence and such threats as prevented Mr. Geis, the prosecutor, from retaining his possession or control over that house or hotel, then this defendant is guilty. But if you are not so satisfied beyond a reasonable doubt, then it would be your duty to acquit the defendant. . . . .

The jury rendered a verdict of guilty of forcible detainer, and not guilty of forcible entry. The defendant, thereupon, moved for a new trial and in arrest of judgment, assigning in support of the latter part of the motion the following reason:

"The indictment does not sufficiently charge the offence of forcible detainer, distinct from forcible entry, to sustain a conviction and sentence."

By the court: Motion denied; exception.[4]

The court, thereupon, adjudged the defendant to pay a fine of $25 and costs of prosecution, or give bail to do so within ten days, etc., when the defendant took this appeal, assigning for error:

1–3. The parts of the charge empraced in [ ] [1 to 3]

4. The refusal of the motion in arrest of judgment.[4]

*Mr. A. L. Cole*, for the appellant:

The defendant was lawfully in possession, under a written agreement, with no notice to quit, and he had a legal right to protect his possession and property from the scrambling pos-

session of Geis or any other person. The agreement of October 17, 1889, undoubtedly gave Knarr possession, and Geis's acts, down to the day of the quarrel, show that he considered himself acting for Knarr. The only offence the defendant committed was no greater than merely holding over without a notice to quit. The case of the commonwealth was tried on the theory that Geis had possession. But the finding of not guilty as to forcible entry is a finding that he was not in possession. And the conviction of forcible detainer is improper under this indictment. Geis having no possession, and no title or right of possession being laid in the indictment, there can be no such offence in the case as forcible detainer: Wharton Cr. Law, §§ 1103, 1108; Commonwealth v. Toram, 2 Pars. 411; Commonwealth v. Rogers, 1 S. & R. 124. Merely refusing to go out of a house, or denying possession to a lessee by a tenant at will, is not a forcible holding within the statute: Wharton Cr. Law, § 1103; Rex v. Oakley, 4 B. & Ad. 307.

*Mr. Smith V. Wilson*, District Attorney, for the commonwealth:

1. If Knarr was a tenant of Weber, which we deny, he was not entitled to notice to quit, as the lease assigned to him was definite as to the day of its termination, and it was his business to apply to Weber for a renewal if he wished to remain: Hemphill v. Flynn, 2 Pa. 144; McCanna v. Johnston, 19 Pa. 437; Logan v. Herron, 8 S. & R. 460; Rich v. Keyser, 54 Pa. 86; Boggs v. Black, 1 Binn. 335; Bedford v. McElherron, 2 S. & R. 49. There is no evidence that Weber intended to treat Knarr, after October 1, 1889, otherwise than as a mere trespasser. There is evidence on the other hand, that he intended to dissolve his relation with Knarr by giving a lease to Geis. Even Knarr's rights in the bar-room, whatever they were, were gone after October 1st, because Geis then had a lease from Weber of the whole hotel. Two cannot claim possession adversely, at the same time; and, whenever the unlawful entry of one, with force, necessarily dispossesses the other, an indictment for forcible entry and detainer may be maintained: 2 Wharton Cr. Law, § 1105.

2. By §§ 21, 22 of the crimes act of March 31, 1860, P. L. 390, the crime of forcible entry and detainer is divided into two

parts. While, as no title is laid in the indictment, there could have been no sentence of restitution, the contention that the defendant could not be convicted of forcible detainer and sentenced to pay a fine and costs, cannot stand a moment in the light of the decisions, the laying of possession in Geis being sufficient for that purpose : Torrence v. Commonwealth, 9 Pa. 184; Daniels v. Commonwealth, 7 Pa. 371; Commonwealth v. Miller, 107 Pa. 276; Wharton Prec., 489; Wharton Cr. Law, § 1110; Commonwealth v. Rogers, 1 S. & R. 124; Burd v. Commonwealth, 6 S. & R. 252; Huntzinger v. Commonwealth, 97 Pa. 336. Geis was always in possession from August 1st to October 9, 1889, and Knarr was always out. That Knarr succeeded in getting in peaceably, before he expelled Geis, does not relieve him from conviction of forcible detainer.

OPINION, MR. JUSTICE GREEN:

It was affirmatively proved, and entirely undisputed, on the trial of this case, that Geis and Quigley, on September 17, 1889, sold and transferred to the defendant, Knarr, all their " right, title, and interest" in their lease of the National Hotel in DuBois, and agreed " that said Knarr shall have possession thereof at once, with all our rights and title." This sale and transfer was effected by a written agreement signed by all the parties. The original lease itself, made by Weber, as executor of the owner, Mrs. Painter, was a verbal lease, made August 1, 1889, and to continue for two months. It would therefore terminate on October 1st. It was further stipulated in the agreement as follows, viz.: " By permission of said H. S. Knarr, the said W. C. Quigley and Charles Geis are to run the hotel or boarding-house part thereof, free of charge, to said October 1, 1889, but shall contract no bills on his account. The bar shall be under the sole and exclusive rental of said H. S. Knarr." Knarr agreed to pay, in consideration of the sale and transfer, $175 to Quigley, and the costs in a certain suit. Knarr was the owner of all the furniture in the hotel, which had cost him, as he said and was not contradicted, about $8,000. It will be seen, therefore, that Knarr became the lessee of the entire hotel; that he had, and continued to have, exclusive control over the bar department; that he was the owner of all the furniture in the hotel; and that Geis and Quigley had a permis-

sive occupancy of the boarding-house part of the hotel free of charge until October 1, 1889, but were to contract no bills on Knarr's account. Quigley left very shortly after, and claimed no further interest or possession. Geis and Knarr, by a friendly arrangement, agreed that Geis should collect from the bar-tender employed by Knarr the receipts at the bar each day, and pay them over to Knarr the next morning. This arrangement was literally carried out, and in a perfectly friendly spirit, not only up to the 1st of October, but continuously on, until the 9th, when the difficulty which gave rise to this proceeding arose between them. The executor of Mrs. Painter had advertised the hotel at public sale to be held on October 8th, and in fact he did sell it on that day to strangers. Quigley testified that he had transferred the license to Knarr, and that, as he understood, they were to have the house until they got their boarding accounts, until the first of the month. Under these facts, which are undisputed, it must be conceded that Knarr became and was the lessee of the whole house; that he had exclusive possession and control of the bar department; and that the occupancy of Geis was by the permission of Knarr.

When the 1st of October came, Geis made no claim to any different possession than he had under the agreement of September 17th. He gave no notice to Knarr that he had or held any other interest in the premises than that. Weber not only did not notify Knarr to quit or to give up possession of the hotel or any part of it, but did not inform him that he had made any lease or other disposition of the property, and so admitted on the witness stand. No objection was made by any one to Knarr's continued possession, and, in point of fact, he did continue his previous possession without any change of his relation with the landlord. This state of things went on until the 9th of October, Geis continuing to collect and pay over to Knarr the bar receipts up to that day. The hotel property was sold on the 8th, and possession was to be delivered to the purchaser on the 1st of November following. On the 9th, Geis testified he came out of the dining-room in the afternoon, and found Knarr in the office; that Knarr told him to get out; that he then told Knarr he had a lease of the property, and had a right there; that Knarr grabbed him by the throat;

Opinion of the Court.

that they had a fight for about five minutes, which amounted
to nothing ; that no blows were struck ; that each grabbed the
other ; that when it was over he went to see Weber ; that when
he came in again Weber was there, and Knarr held up a club,
after which he and Weber went to the office of a justice, and
had Knarr arrested for forcible entry and detainer ; that he then
went back, and had another scuffle with Knarr, who told him
to get out, and if he didn't go out he (Knarr) would knock
his (Geis's) brains out.  He then had Knarr arrested for as-
sault and battery, and did not go back to the hotel, but left
Knarr in possession.  Knarr gives a very different account of
the matter, but, in the view we take of the case, it is not neces-
sary to repeat it.  Geis does not say that he exhibited any
lease to Knarr, or that he told him any particulars of it.  It
appears that Weber had made a lease to Geis, dated Septem-
ber 30th, but really executed on the 28th, to continue for one
month.  But both Weber and Geis admitted that they had not
informed Knarr of it, or made it known to him in any way.  The
first information Knarr received of it was on the 9th, in the
fracas with Geis.

In these circumstances, we are very clear that there was no
case of forcible entry, or forcible detainer, under the facts.  No
notice having been given to Knarr of any change in his position
as lessee at the termination of his lease, and he being permitted
to continue his possession peaceably and quietly, after the 1st
of October, he was not bound to give up the possession on that
day, but had a right to expect he would not be called upon to
leave.  The case was peculiar.  The property had been sold
on October 8th, and was to be delivered to the purchaser on
the 1st of November, only twenty-two days later.  He could
have no reason to expect that an entirely new and different
lease would be made to another person for so very short a pe-
riod, and, having been permitted to hold over after the expira-
tion of his lease, he had a clear legal right to remain until
notified to quit.  He was in no sense a trespasser.  What was
the state of the civil rights of the parties as to the right of
possession after October 9th, it is not necessary to inquire.
There was ample remedy for the landlord to recover possession
by civil proceedings for that purpose.  But it is clear that no
possession existed on the part of Geis on October 9th, such as

is necessary to make out a case of forcible detainer from the facts in evidence. His possession, such as it was, he held by the permission of Knarr. It was in no sense exclusive of Knarr, who was the lessee, whose furniture filled the house, without any right on the part of Geis to use it except under the written agreement of September 17th with Knarr, and who was in the sole and exclusive possession and control of the bar department. On that very morning Geis had recognized and assented to the relative position and rights of himself and Knarr, just as they were from September 17th up to that day, by paying over to Knarr the receipts of the bar for the previous day, which had been paid over to him by Knarr's bar-tender. Not the slightest notice had been given to Knarr, either by the landlord or Geis, of any change in the existing state of the possession and use of the hotel. In Burd v. Commonwealth, 6 S. & R. 252, GIBSON, J., said: " The courts at present are far from encouraging prosecutors in having recourse to this mode of proceeding, except where there has been an invasion of a quiet, peaceable, and undisturbed possession, held by virtue of such an estate or interest as is plainly within the protection of these statutes." It is not possible to say, under the evidence, that Geis had any such possession as against Knarr, or any possession at all, except by the permission of Knarr, and even that permission Knarr was only bound to continue until October 1st.

No estate in Geis was laid in the indictment, and, even if there had been, as it would have expired on November 1, 1889, there can be no award of restitution. The only question, therefore, really at stake, is a question of costs, and the payment of a small fine. The difficulty between the prosecutor and the defendant does not seem, under the evidence, to have been anything more than a sudden quarrel, not over the possession of the property, but resulting from an excess of temper, and ending in an assault by each upon the other. This was referred to the Quarter Sessions upon complaints for assault and battery by each. There are no facts in the case which justify a conviction of either forcible entry or detainer, and hence the judgment must be reversed.

　　　　　　　The judgment is reversed, and the defendant is
　　　　　　　　discharged from his recognizance, without day.