## COMMONWEALTH v. JOHN McMANUS.

APPEAL BY DEFENDANT FROM THE COURT OF OYER AND TERMINER OF PHILADELPHIA COUNTY.

Argued March 23, 1891—Decided June 5, 1891.
Concurring opinion filed October 19, 1891.
[To be reported.]

1. On the trial of an indictment for murder, the testimony being undisputed that the prisoner, his mistress, and the deceased were together immediately before the killing, with other testimony tending to show the prisoner's jealousy as to the mistress, his conduct an hour previous, in threatening her with a pistol, was admissible upon the question of the supposed motive.

2. Assignments of error which are but minute criticisms of the language of the general charge, whereby the jury are aided in reconciling discrepancies in testimony that is divergent and contradictory, by a review thereof in general terms, with substantial accuracy, and with suggestions fairly warranted by it, do not disclose reversible error.

---

* This opinion was filed in the Supreme Court, to both causes.

Statement of Facts.

3. The prisoner being charged with murder by shooting with a pistol at a street corner, a point for instruction that " Before the jury, in this case, can convict of murder in the first degree, they must find that the prisoner acted upon as clear and premeditated a motive as he who kills by poison or by lying in wait," was properly refused as likely to mislead.

4. Where, on a trial for murder or manslaughter, points are presented for the prisoner, the measure of the court's duty, under § 58, act of March 31, 1860, P. L. 444, is " to answer the same fully ; " and if the law of the case is plainly, fully, and accurately presented, though the judge has chosen to state it in his own words, the duty is discharged and there is no ground of complaint.

(*a*) A request of a prisoner for the instruction, that " the jury are judges of the law as well as the fact," was answered thus : " The statement of the law by the court is the best evidence of the law, within your reach ; and therefore, in view of that evidence and viewing it as evidence only, you are to be guided by what the court has said with reference to the law : "

5. The answer was in entire harmony with Kane v. Commonwealth, 89 Pa. 522. The jury were left to decide the whole case upon the law and the evidence,—not upon the law as distinct from the evidence ; and they were instructed as to what was the best evidence of the law : they were " to determine the law and the facts, under the direction of the court, as in other cases."

6. " The point should, in my opinion, have been answered with an unqualified negative. The jury are not the judges of the law in any case, civil or criminal. Neither at common law, nor under the constitution of Pennsylvania, is the determination of the law any part of their duty or their right : " Per Mr. Justice MITCHELL, concurring in the judgment.

7. The jury are to determine "the law and the facts as in other cases ; " that is, the law as given to them by the court, and the facts as shown by the evidence. They are bound to take the law from the court ; but, so taking it, they have the right to apply it to the facts as they may find them to be proved, and to announce the result of the whole by a general verdict : Per Mr. Justice MITCHELL.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 119 July Term 1890, Sup. Ct.; court below. No. 110 March Term 1890, O. & T.

On March 6, 1890, the grand jury returned as a true bill an indictment charging John McManus with the murder of Eugene McGinnis, on February 21, 1890 ; certified. On

Statement of Facts.

March 7th, the prisoner, being arraigned, pleaded not guilty. Issue.

At the trial of the indictment on April 28, 1890, the case presented by the evidence was in substance as follows :

On the evening of February 21, 1890, eight or ten men, including Eugene McGinnis, the deceased, met at the house of Cora Campbell, on Stampers street, below Third, in Philadelphia, for a merrymaking meeting after the municipal elections. The party had supper, and both before and after there was much drinking. McManus, the prisoner, called early in the evening. The party became noisy, to such an extent that Cora Campbell said she would leave. McManus persuaded her to go to his rooms at 419 Lombard street, about two blocks away, where he lived with a mistress, Amanda Cross. The prisoner, as he and witnesses in his behalf testified, had been drinking for several days, and had joined in the drinking at Cora Campbell's place. After reaching his rooms, he and Cora Campbell and Amanda Cross had more beer. In a short time, Cora Campbell became uneasy about the party of men and the noise at her house, and at her suggestion the prisoner went with a message to one of the inmates. The prisoner not returning to his own home in a reasonable time, Amanda Cross, at the suggestion of Cora Campbell, went after him. She rapped at the Stampers street house, called the prisoner out, and, telling him that Cora Campbell was sick, they started for their own home. This was a little before nine o'clock.

As to this point, in the order of time, Wm. J. Koch, a barber, called by the commonwealth, testified that he heard a man and woman go by his place on Third street: "I didn't see them; I heard them go by, and the woman was crying; so I went to the shop door, to see what was the matter."

Q. What did you see?

Objected to, as to anything that occurred at a quarter of nine o'clock, unless it is to be followed up or connected with this transaction.

Mr. Graham: It is; it is a part of the transaction.

By the court: I am inclined to think that everything the accused did, on the day on which an offence of this kind may be committed, may be brought in evidence as part of the case of the prosecution. What do you offer to show?

### Statement of Facts.

Mr. Graham: I offer to show what took place between Mc-Manus, the prisoner, and Amanda Cross, at nine o'clock, or thereabouts, on the night of the 21st, as bearing upon the question of motive; to be followed up by what took place about an hour later, about ten o'clock, when the same McManus and the same woman, Amanda Cross, and McGinnis were present at the time of the shooting; the theory of the commonwealth being that this prisoner was jealous of this woman and of Mc-Ginnis, and that he killed McGinnis because of that jealousy.

Objected to.

By the court: Objection overruled; exception.

By Mr. Graham: "Q. You went to the shop door to see what was the matter? A. Yes, sir. Q. Did you see the persons there? A. I saw the prisoner and Amanda Cross go down Third street. Q. Which way? A. Down towards Lombard. And the woman was crying. Q. What was he doing? A. They seemed to be quarreling, but I couldn't understand what they were saying. Q. He was talking in a quarrelsome tone, was he? A. Well, it wasn't very loud, but still you could understand that they were talking together. And when they got about three pavements below me, the prisoner went to work and pulled out a revolver out of his pocket and held it to Amanda Cross's head. The prisoner was walking on the inside, towards the house, and Amanda, towards the gutter. Q. Then what took place when he pointed the pistol at her? A. She threw up her left hand like this (illustrating) and she says, ' Oh, don't.' Then the prisoner went to work and took the revolver out of the right hand and put it in his left, and stuck it in his pants pocket on the left-hand side. Q. How near were they to you? A. They were three pavements below me, then. Q. Was that all you saw at that time? A. That was all I saw at that time. I went right back in the shop, then."

Afterward, the prisoner stopped at a saloon and bought a half pint of whiskey. On reaching their home, they found Cora Campbell lying on the floor, sick, when the prisoner gave her a drink of the whiskey, and, as was stated, drank the rest himself. He then took off his coat, shoes and stockings, threw himself on the bed, and fell asleep. He was aroused afterward, Cora Campbell insisting that either he or Amanda Cross should

Charge of Court below.

accompany her to her house. The prisoner slipped on a pair of cloth house-shoes, and without stockings, hat or coat, went with her. Amanda Cross went also, but apparently without his knowledge. They reached the house of Cora Campbell about ten o'clock. There the prisoner had more beer, and turning about discovered Amanda Cross, and said to her " Get out of here ; go home." The prisoner and Amanda Cross left about the same time. The testimony of the commonwealth tended to show that McGinnis then went out also, but may have gone out at another door. At all events, in a few moments, as the commonwealth's testimony tended to show, the prisoner, with his shoes in his hand, came up with McGinnis and Amanda Cross at the corner of Third street, where they had an altercation. McGinnis knocked the prisoner down. Amanda Cross helped him up, and then fled. Immediately afterward the prisoner fired two shots at McGinnis, one of which killed him.

At the close of the testimony, the court, HARE, P. J., charged the jury :

This case stands somewhat apart in some particulars, because it is not a case in which there is any denial that death was inflicted by a deadly weapon, nor that it was from the prisoner's hand that the blow came. And the questions in dispute, it has been so stated by the defendant's counsel this morning, are, first, whether there was such provocation as reduced the offence to manslaughter, a question which does not arise except upon the testimony of the defendant himself and Amanda Cross ; and, second, supposing that there was no such provocation as the law can consider or allow, whether there is sufficient evidence to show, not merely that the prisoner acted with an intent to kill, but that the intention with which he acted was wilful, premeditated, and deliberate.

—The court here referred to the facts given in substance in the foregoing statement, up to the point of time when the prisoner went with the message to Cora Campbell's house ; and proceeded :

While there he drank a certain amount of beer ; how much is for the jury to say. We have no measure here in court, and if we had it would not be very easy to apply to the divergent

Charge of Court below.

testimony of the witnesses; but, [according to Troyard, there were but two gallons of beer brought to the house while Mc-Manus was there, and of those he had only his share, amounting in all to something over a tumbler, or perhaps to a tumbler and a half, which was drunk, if I am not mistaken, out of tea-cups, all the glasses in the house having been broken in the course of that afternoon or evening.] [2]   While he was there, Amanda Cross made her appearance at the door, coming from her house and inquiring for him; and when he went to the door, in answer to the summons, and asked why he should come home, she gave as a reason that Cora Campbell was sick, in the literal acceptation of the term, and wanted to see him.   To this he responded kindly and sensibly and reasonably,—let it make either in his favor or against him that he obeyed such a summons, and proceeded down Third street as far as Lombard [where he bethought himself that there might, in view of the condition of the person at his home, be need of a little whiskey for this woman, as I understand it.] [3]   He, accordingly, went to the nearest place and bought a half pint of whiskey, which he took to the house, found Cora very sick, and as soon, I suppose, as she was in a condition to swallow, gave her some of the whiskey, and, as Amanda Cross says, drank the rest.

—The court then referred to the testimony of Barber Koch, as to the quarrel between the prisoner and Amanda Cross, when the latter brought him home from the Stampers-street house, and to the return of the three to said house about ten o'clock, and proceeded:

When they reached the door an event occurred which certainly seems to have some significance.   Cora Campbell went in first; McManus followed, but when Amanda Cross attempted to enter, according to her own statement and the statement of Troyard, she did not get further than the door, for McManus barred the way and peremptorily told her to return home.   It seems, however, that he either did not immediately accompany her, or that she did not immediately obey, for he found time to take another half tumbler of beer, which was given him by Cora Campbell.   He then went out of the side door into the yard, where Amanda had preceded him, and we have no direct proof of where they went afterwards, or when.   I did not quite understand whether the side door of the house led into a small

Charge of Court below.

alley between the barber shop and that house, but it seems that the door opened into a yard.

How they got out of the yard we do not know except that as they did not return to the house, whenever they did go out they must have gone out through the gate. Some of the witnesses in the house, one at any rate, said that McGinnis went out with them, all three talking together, and so the defendant declares, and so says Amanda Cross; but Troyard, who seemed to me to be a very truthful, consistent and fair witness, declared positively that McGinnis was not in that room, and did not go out with them, but was in the front room, and if he did go out did not go through the yard, he, Troyard, having been, if I recollect aright, at the steps into the yard for some little time. I am not sure about that; but, at all events, his testimony is that McGinnis did not come out of that room or go out into the side yard.

[Here, there begins not merely divergence but contradiction. Agreeably to the commonwealth's evidence, Amanda is found alone in Third street immediately after this occurrence; I mean to say, without McManus. She was found on Third street with a man in her company, who was McGinnis, he being within the line of view. This is all for the jury, and I merely state what the witnesses said on either side, and what seem to be the necessary inferences; and it is for the jury to say whether they believe the witnesses who state those facts, and whether they draw the inferences which those facts seem to warrant. Amanda is found on Third street, some thirty or forty feet from the corner, in company with McGinnis, McManus not being there; and they were talking pleasantly enough, except that, according to Mannen's statement, who overheard the conversation, or something of it rather,—he did not hear all, as they were talking in rather a low tone,—he said, "You are a liar." Mannen opened the window to listen, and they then moved further towards Stampers street, from which they were not separated by any great distance, probably by some sixty feet, and moved on and on until they came to the pavement of, as it is called, the candy store, which was in the same house as the barber shop, and finally reached a large tree on the curbstone in front of the barber shop, and still proceeding further, went northward along the line of Third street until they

Charge of Court below.

came within three feet of Stampers alley or Stampers street, which, you recollect, continued to be Stampers street after it crossed the line of the pavement of Third street, so that Stampers street had a right to this corner, small street though it was, as much as Third street. There was a corner there; so it might be called the corner of Stampers street, as it might be called the corner of Third street, as that corner was one and the same corner. The cartway of Stampers street traversed the pavement of Third street, and reached the point which was the corner of both streets, the corner where both streets met. There, says Mannen, they disappeared from his view, and the next thing he saw was the woman going up Third street, when she came into sight again, and also McManus coming upon the scene, and also McGinnis who had re-appeared. That is to say, Mannen did not say he re-appeared, but he says in the course of his examination that he went out of view, and that he was again in view.

Now, it is easy to perceive that McManus might have shifted his position a little during the time that intervened, when Mannen speaks of having seen him, and the time when Mannen speaks of his having re-appeared, because during that time occurred the flight of Amanda and the high words which led to the shooting, and his departure after Amanda and his return. So that, on that small pavement, twelve feet wide by five or six in length across, these men no doubt shifted their position this way and that. He saw then McGinnis on this pavement and he saw McManus on this pavement, and he saw McManus fire at McGinnis and he saw McGinnis retreat a few feet until coming behind the line of the houses he spoke of, he could no longer be seen, and there his testimony closed.

Now, as it seems to me, in proof of this there is a cotemporaneous witness, the barber Koch, who, chronologically, comes next to the front. He heard the loud words, the angry words between McManus and McGinnis, of which we have no definite account, which aroused his interest, and he climbed on the hydrant and looked over the fence, and there he saw McManus and McGinnis; McGinnis, as he says, on the southeast corner, and McManus on the northeast corner. He, Koch, says on the southeast corner of Stampers alley, and McManus on the northeast corner of Third street; but the southeast corner of

Charge of Court below.

Stampers alley, as I have already said, is also the corner of Third street, because the two streets coincide there and form an angle. He therefore places definitely McManus on the north side of the street, and McGinnis on the south side of the street, with the alley between them, or the street between them; I mean Stampers street; except that McManus by this time was leaving McGinnis and going across the street to the north, with the design of proceeding up Third street towards Pine.

Now, it is said that there is there a material discrepancy between Mannen's statement and Koch's statement. It is certain that in many respects they coincide. They coincide that McManus and McGinnis were there together; visible or invisible, Mannen is not wrong when he says that McManus and McGinnis were there together. They do not differ in Amanda being with McGinnis, and they agree as to the shots, which is a capital fact, though of course not necessarily conclusive; that they were fired by McManus at McGinnis, and that the result was the infliction of the wound which appears to have been mortal. But it is said that they differ as to place, and that they differ as to the possibility of McGinnis being where he could be seen by Mannen at the time of the shooting. At first, I was inclined to think that such must be the case. It is for the jury to say whether it is so or not. But when I came to look closely at the evidence and to see that Mannen places Amanda and McGinnis three feet from Stampers alley, from the corner of Stampers alley and Third street, and that what Koch says is that it was on his corner, it did not appear to me that that was necessarily a contradiction, because the corner from his point of view was Stampers street, and from the other man's point of view it would be Third street, but those two corners would be one and the same place. And, though it is true that when McGinnis fell, retreating to this position, falling back, he was three feet, half the length of a man or a little more than half the length of a man inside of Stampers street, yet it might still be that when he was shot at he was sufficiently far out, half way across twelve feet, or nine feet from where he finally lay, and so within the view of Mannen. The jury will judge whether those statements corroborate or contradict each other. As to some of the points I think it is not denied that there is corroboration and agreement.] [4]

Charge of Court below.

Another witness now makes her appearance, Mrs. Fisher. Mrs. Fisher has heard angry voices in the street; she has heard two shots fired; she leaves her bed, raises the window which is partly open, and looks out; and she sees McManus standing on the opposite side of Stampers street, and McGinnis lying upon her side, and she sees McManus threatening McGinnis; or, I will not say threatening, but taunting him—saying something in a taunting tone; that something sounded to her as, " Now, arrest me if you can! " [It is not necessarily safe to gather from an answer what the remark was, but it did strike me that if McManus at that moment of emotion found a ready taunt of " Now, arrest me if you can," something must have been said about an arrest before; that the man whom he was addressing in this way must have said something about arresting him, if he did not mend his manners or did not cease to give cause for fear, or some such remark as that. I do not well see why one man should have said, " Now, arrest me if you can," unless the other had said something like, " If you do not desist, I will have you arrested." ] [5]

I forgot to state, however, and it was a very considerable omission on my part, what Koch narrated of the words and acts that immediately preceded the shooting. When Koch first looked out, McManus, who had apparently been on the same side of the street as McGinnis,—and I believe it is not denied that they were there,—was crossing the alley to go away. Koch had heard the woman scream, and we know from another witness that this woman was Amanda, and that she fled— " flew wildly," to use Mr. Naulty's words, up the street, as if afraid of being pursued, and we know from Naulty, as well as from Koch, that McManus made a move after her; before he got half across the street, more than half across the street, with this purpose apparently in his mind, he is accosted by McGinnis, who says to him, you recollect the words, " Come back to me, Johnny; " " Come back to me, Johnny," and as McManus still went away, " Damn it, Johnny, come back to me ; " and then McManus halted and wheeled around, and did come back to McGinnis. Why he did I do not know. It may be simply because McGinnis asked him; it may be because he saw that Amanda had gone too far to be easily overtaken; it may be because—and little things will sometimes determine a man

Charge of Court below.

even at critical moments—because he was in his bare feet, and it was not pleasant on that February night to run at anything like speed up the street without shoes and stockings. From whatever cause, he did turn around and go back towards McGinnis, and that in no very pleasant frame of mind, for the first words he spoke were words of great bitterness when viewed in the light of what followed. He said, "You will fool with my girl, will you?" [and repeated the remark, thus showing the motive that was actuating him, the motive being, apparently, jealousy of this woman with whom he lived, and that he believed McGinnis was, or was endeavoring to be, too intimate with her.] 6   Then followed the threat, or, what was something more than a threat, for, as the result showed, it was the declaration of a purpose, "I will settle you," or "I will fix you," and then finally came the shot, which may or may not have taken effect, and the second shot. But, whether the first had taken effect or not, it showed that the purpose with which he shot was persistent, and gave emphasis to the natural inference that in shooting he meant to kill. These shots were both seen from up the street by Mr. Naulty, and I believe there is no denial of them, nor would it be easy to contest the natural inference to be drawn from that of a persistent intention to take life. . . . .

[Now, there is very little to add except that McManus then proceeded to go up the street with his shoes off, endeavoring to put them on as he walked, and in so doing necessarily somewhat halted. I shall now have to revert to that, in order, if possible, to find the explanation why he who had his shoes on, who came out clothed, if not in all respects in his right mind, to Cora Campbell's house, was now in the street with his shoes in his hand; and the question naturally arises, how did that happen? Moreover, according to the commonwealth's witnesses, he is found there with his shoes in his hand, not with Amanda, as one going with her as her companion, but as following her, she having had time to go around the corner and have a little talk with McGinnis.] 7

Now, how did it happen that McManus took his shoes off, and was found with them in his hand. The conjecture, the inference of the commonwealth is, and it is for the jury to say whether it is of any value, that he remained behind in the yard

Charge of Court below.

of the house for the purpose of seeing whether Amanda would obey him. He had forbidden her to go to this house. When she came there to ask for him in the first instance, he had his suspicions of what brought her, whether she came to find that he was there, or that he was not there; and, consequently, when he left the house he reproached her, as the barber says he did, and threatened her, as the barber says he saw him threaten, by putting the pistol to her head; that, when she came with him the third time, he forbade her to enter and told her to go home; that he saw her go out of the gate, and he remained behind as if to enter the house, which he did not; but, having waited for a short time until she would be, if she meant it, well on her way home, took his shoes off his feet, came as quietly as might be to where he would have an opportunity of seeing, and there found his suspicion verified, and this woman, in whom he could not perhaps place entire confidence, in close confabulation with McGinnis; and then it was that his anger, which was terrible to face, especially, at all events, when he had a loaded pistol with him, broke forth; that she screamed and fled in terror of her life; that he pursued her, and, finding it not comfortable to follow, having had a few hot words with McGinnis, came back at McGinnis's instance; that the wrath which he had been nursing in his bosom, which he had evinced by producing the pistol already, and perhaps was intended for her, was now turned on McGinnis, and that he approached McGinnis with the menacing words related by the witnesses, and finally, declaring his purpose to fix or settle him, held forth the pistol. There was still a little time in which he might have changed his mind and given this man his life; and he asked for it, or said, "Don't give it to me; don't give it to me;" then came the shots.

This is the commonwealth's version of the case, and it is for the jury to say, both as to the facts and as to the inferences, how far it deserves their acceptance; how far it is sustained; what basis it offers for their verdict, and what verdict they ought to render.

I ought to state, I do state, and I should be sorry if I did not state the evidence on the other side. As I have already told you, that evidence is that McGinnis, McManus, and Amanda went out together; that he did not remain behind,—

that is what impliedly they say; they say that which could not be if the other was true. She could not have been around the corner talking with McGinnis. They say that as they went along, all talking together, McGinnis made the remark, in connection with McManus repeating the order to her to go home, of " Send that bitch home," upon which McManus took up her defence, and said that she did not deserve that name. Then McGinnis replied she was something that was still more definite, and something worse, in which he was contradicted by McManus, and then, without further offence, without anything further having been said by McManus to excite his ire except the simple contradiction of the opprobrious remark addressed to this woman, McGinnis, this friend who had been on such good terms with him all along, with whom he had never had any quarrel, raised his fist and felled him to the ground. He allows him, however, Amanda helping to raise him, to get on his feet, and then, there having been nothing, except, to be sure, the hard words, with nothing in them of dread or danger to her, she flies, runs away and McManus remains, smarting under the blow and angered beyond endurance by this abuse, and this most undeserved chastisement, levels the pistol, and kills McGinnis.

Now, gentlemen, you have the two stories, each contradictory of the other. The witnesses for the commonwealth expressly or impliedly contradict these two people who come forward for the defence, and, on the other hand, [if their testimony is true, this story of Koch is not true; it becomes incredible; ] [8] and of course, as in every instance where there is a conflict of testimony, the jury are to say which should be believed, which is probable. Is it probable that McGinnis would so assault McManus, or is it more likely that the story told by the other side is correct, and that McManus attacked McGinnis in consequence of this suspicion of the girl's fidelity, and of McGinnis' conduct with her?

—Here, the court considered the subjects of provocation and cooling time, and proceeded:

Now, the question presented by the commonwealth, and the inference is of a very different kind; and before I approach that, perhaps I ought to say, and indeed it is my duty to state the general principles which govern the law of homicide.

Charge of Court below.

These are, that murder is a malicious taking of life. In general terms, a malicious taking of human life is murder. [Murder in the first degree is a malicious taking of human life with an intent to kill.] [9] Murder in the second degree is the malicious taking of human life without an intent to kill. And, finally, manslaughter, as I have already told you, is the taking of human life where, owing to the provocation arising, and the hot blood produced, the presumption of malice is repudiated, and the man is supposed to be acting under the influence of passion, which temporarily displaces his judgment and leaves him a mere slave of impulse; and where, though still criminal, he is not to be taxed with murder.

Now, the commonwealth, rejecting as it does utterly the testimony of McManus and the woman, presents the case to you as to the inference which you should draw with reference to the death of McGinnis, on the supposition that the commonwealth's witnesses are true, and tell the story truly. And before proceeding to that, I will read what I have written here, because I wish to be sure that I express myself accurately.

To constitute murder in the first degree, there must be a deliberate, wilful and premeditated intent to kill. The accused must have formed the design to take life before firing the shot which caused death. I speak of the case before you. It is not, however, requisite that the homicidal purpose shall have existed for weeks, for days, or even for hours before it was carried into effect. If a man resolves to take life, and accomplishes the design with a blow or pistol shot, he may be a murderer in the first degree, however brief the interval between the resolve and the act by which it is carried into effect. It has been justly said that thought is swift, and that a vindictive man may require little time to form a design to take life, and less to execute his purpose. But it is also true that the shortness of the time is an argument against premeditation, and should be considered in determining whether the crime was premeditated. I will add to this one other principle, and then I think I shall have covered the ground; and that is, while taking life with a deadly weapon is evidence of an intent to kill, and gives rise to the natural inference that the man designed to accomplish the act, it is not enough to constitute murder in the first degree, unless there are other circumstances in the case besides

Charge of Court below.

the mere act of killing, to justify the belief that the intent to
kill was premeditated and deliberate.   There must be in the
evidence before the jury, from which ever side it may come,
enough to show the premeditation and the deliberate intent,—
not merely that it was there at the time the shot was fired, but
that it was there previously ; that the accused formed the in-
tent and then carried it into execution.

—The court here instructed as to the inferences claimed to
be authorized by the testimony of the commonwealth tending
to show motive and premeditation; careful instructions were
also given upon the subject of intoxication as affecting the de-
gree of the offence, under the evidence, none of which were
excepted to save the following :

If you find that McManus had taken a good deal of liquor,
another question may arise : What was the effect on him?   The
effect of liquor depends, in many instances, upon the man who
drinks.   [A man who is accustomed to swill beer may no doubt
take more glasses than the man who hardly ever touches that
article; so with liquor of any other kind.   But, taking Mc-
Manus's account of what he drank on election day, I would
not suppose that there could be much difficulty as to which
category he should be placed in, for he said that on that day
six boxes of beer, containing two dozen bottles each, one hun-
dred and forty-four bottles in all, had been disposed of in a few
hours by himself and seven or eight others.   When further in-
terrogated he said twelve or fourteen.   He finally said, as I
recollect, between eight and fourteen; he declined, however,
to be at all precise.   He said this had not interfered with his
electioneering or disturbed materially his head; that he drank
afterwards in various places in the Fifth ward, and finally wound
up at another club; and when asked as to the effect upon him-
self, as I understood his answer, either then or at any other time,
he said as to that time that he was intoxicated, and avoided the
use of the word " drunk."   He did not say, what easily might
have been said, that he was carried home, or could not walk
home, or that he was in the condition that such an enormous
quantity of liquor might be supposed to produce.   It seems to
me that there is some reason for supposing that McManus is
one of those men whom a certain amount, even of hard drink-
ing, will not necessarily incapacitate or disable.] [10]

### Charge of Court below.

But finally, there is in this matter something which, as I have already intimated, perhaps deserves the attention of the jury more than any number or kinds of glasses of liquor taken, and that is what is the general impression left on your mind as to McManus's conduct that afternoon and evening, and whether he was measurably master of himself. I have no doubt that he was under the influence of liquor more or less; perhaps that might be true of many evenings in his life, some we certainly know; but whether he was in the full sense of the term "drunk," and so drunk that his mind was no longer capable of acting consciously or regulating the actions of his body; whether anything which he did amiss, and he certainly did a deed that was amiss, was due to a disorder of the mind produced by liquor or was produced by his own vindictiveness arising under what he felt as gross provocation,—that seems to me to be a test which the jury may fairly apply and one of which he could not complain. It is for you, upon the whole matter, to say, in view of what I have said to you, whether you will find that there was such intoxication, such drunkenness on his part, and such disability of the mind as well as of the body as to stand here as a reason for an acquittal of the gravest offence, supposing under the evidence you would otherwise convict him.

I now have rather a difficult duty to perform. Thirty-three points have been presented to me containing a statement of the law of murder in a great variety of forms, almost like the shifting of the kaleidoscope in which, though the beads are the same, at each turn a different aspect is presented, and where it is rather difficult to know precisely, or to recollect what the impression is. If I should read these all over to you and affirm them all, I do not know whether they would leave on your minds a series of ideas that would form a consistent whole; not that I find the least fault with the counsel, who displayed a great deal of ability and ingenuity in framing them, but it makes my task correspondingly difficult. I shall have to do the best I can. You will recollect, however, that what I now say is to be taken in connection with what I have already said; not to be understood as displacing it or contradicting it, but as supplementing it and to be supplemented by it.

I am asked (on behalf of the prisoner) to charge first:

1. The presumption of law does not raise a killing with a

deadly weapon above murder of the second degree. The bur-
den is upon the commonwealth to raise it to murder of the
first degree; and to do so, it is incumbent upon her to prove
every element of that degree beyond a reasonable doubt.

Answer: The reply is, if all that is before the jury is a kill-
ing with a deadly weapon with an intent to kill, the jury are
not warranted in finding a verdict of murder in the first degree.
In order to justify such a verdict, the commonwealth must be
able to point to something in the evidence that shows that there
was a premeditated design to kill, a purpose formed before it
was executed. Whether such is the case or not, in this in-
stance, is for the jury, as I have already told you. I have
called particular attention to the circumstances from which the
commonwealth argues premeditation.

2. To constitute murder of the first degree there must be a
deliberate and settled purpose to take life, and this purpose
must be proved according to law, beyond all reasonable doubt,
otherwise the killing shall be deemed murder of the second
degree.

Answer: I affirm that point.

3. The duty of fixing the degree or grade of murder belongs
exclusively to the jury, and where the jury, upon the whole
evidence, have doubts into which of two grades or degrees a
case falls they must find a milder one.

Answer: I do not know whether it is desired that I should
by that convey the idea to the jury that they can, irrespective
of the principles of law which I have stated on my own author-
ity and of those which I am stating here at the request of the
counsel for the prisoner at the bar, disregard the instructions
which point out what necessarily creates murder of the first
degree and find it murder of the second degree. In that sense,
I would not be willing to say it was exclusively for the jury.
I do say, however, that the duty and responsibility will rest
with you, no one being able to interfere with you on that
question, to decide whether it is murder of the first or second
degree, and, in doing so, if there is reasonable doubt, not a
mere possibility, whether the defendant is guilty of murder in
the first degree, your verdict should be in favor of murder in
the second degree.

The fourth point is declined. I will not read it.[11]

Charge of Court below.

—The point referred to, was as follows:

4. Before the jury, in this case, can convict of murder of the first degree, they must find that the prisoner acted upon as clear and premeditated a motive as he who kills by poison or by lying in wait, and the intent must be proven beyond all reasonable doubt.

13. If, upon the question of drunkenness, the jury are fairly in doubt as to whether the prisoner was so drunk as to deprive his mind of the power of forming a deliberate design to kill the deceased, Eugene McGinnis, then he is entitled to the benefit of that doubt, the same as he is to any other legal doubts arising from the evidence.

Answer: I say in answer to the thirteenth point, that if upon the question of drunkenness the jury have a reasonable doubt, on a review of the evidence, whether the prisoner retained the power of forming a deliberate design to kill the deceased, then he is entitled to the benefit of that doubt the same as he is to any other legal doubt arising from the evidence. If the jury have a reasonable doubt, under a review of the evidence, whether the prisoner was so drunk as to deprive his mind of the power of forming a deliberate design to kill the deceased, Eugene McGinnis, then he is entitled to the benefit of that doubt.

16. Whilst drunkenness is no excuse for crime, it is nevertheless sufficient to prevent the formation in the mind of that deliberate intent to kill which is of the essence of murder of the first degree; and if the jury find that the prisoner was so far under the influence of liquor as to deprive the mind of the power to think and weigh the nature of the act clearly and prevent the formation of a deliberate intent to kill; or, if they have any doubt upon the question of such intoxication, then they must find a verdict of murder of the second degree.

Answer. What I say to the jury is, that while drunkenness is no excuse for crime, it may, nevertheless, be sufficient to prevent the formation in the mind of that deliberate intent to kill which is of the essence of murder in the first degree; and if the jury find the prisoner was so far under the influence of liquor as to deprive his mind of the power to form a deliberate intent to kill, they should find that the murder is of the second degree. But I refuse to instruct the jury that drunkenness is

Charge of Court below.

sufficient to prevent the formation in the mind of a deliberate intent to kill. It depends on how far the man is drunk, whether his mind is besotted with liquor, whether he retains the power to think and deliberate. If he has the power, then no matter how drunk he may be in other ways, he is just as sound a man for the purpose of being tried and punished as if he had never put a glass of liquor to his mouth.

28. The jury are judges of the law as well as of the fact, and may upon the whole case determine the grade of the offence.

Answer: I do not know whether that means that if you should be of opinion that the law which I have stated to you is not the law, you might with propriety find this man guilty of murder of the first degree, although the principles which I have stated to you as applied to the evidence would show that it was only murder of the second degree. I will say this: That you have been sworn to decide this case on the law and the evidence; that the statement of the law by the court is the best evidence of the law within your reach, and that therefore, in view of that evidence and viewing it as evidence only, you are to be guided by what the court has said with reference to the law. But if, upon the whole matter, when you come to make up your minds, you are not satisfied beyond reasonable doubt that this man was guilty, then you are to acquit him.[24]

—The jury returned a verdict that the prisoner was guilty of murder in the first degree.

On May 17, 1890, the court overruled the prisoner's motions for a rule to show cause why a new trial should not be granted, and in arrest of judgment; and the same day, on motion of the district attorney, judgment was entered for the commonwealth on the verdict, and sentence passed upon the prisoner. Thereupon, the prisoner took this appeal, assigning for error:

1. The admission of the commonwealth's offer.[1]

2–10. The portions of the charge embraced in [ ] [2 to 10]

11. The answer to the prisoner's fourth point.[11]

12–23. [These assignments, nearly all, alleged error in declining to give specific answers to certain points presenting legal propositions, but referring to the instructions thereon contained in the general charge.]

24. The answer to the prisoner's twenty-eighth point.[24]

25. "The court erred in the whole charge."

Opinion of the Court.

*Mr. Maxwell Stevenson* (with him *Mr. James L. Stanton*), for the appellant.

*Mr. George S. Graham*, District Attorney, for the commonwealth.

OPINION, MR. CHIEF JUSTICE PAXSON :

The first assignment of error is to the admission of the conduct of the prisoner and the woman Cross an hour before the murder. It was an undisputed fact that the prisoner, the same woman Cross, and the deceased were together when the killing took place, or immediately before, even if the woman did, as she testified, run away before the shot was actually fired. Both the prisoner and the woman, as well as some other witnesses, testified that the quarrel was about the woman, though the exact cause of it is differently related. The theory of the commonwealth was that the killing was done from jealousy ; and under these circumstances, the conduct of the prisoner an hour previous, in putting a pistol to her head, had a bearing on his state of mind towards her, and therefore, on the existence of the supposed motive for the killing. For such purpose it was clearly admissible.

The second and eighth assignments, inclusive, and the tenth, may be grouped together. They are minute criticisms on the language of the charge. Thus, the second is based on the statement of the judge of the quantity of beer as two gallons, instead of two kettles ; an inaccuracy not material to the point of the case, and so far as it had any bearing, not unfavorable to the prisoner. The evidence as to the history of the transaction was, as the learned judge said, at first harmonious, then divergent, and finally contradictory. The jury, as has been often said, were bound to reconcile the discrepancies, if it could reasonably be done ; and the judge aided them in the performance of that duty by a review of the evidence in general terms and with substantial accuracy, making suggestions fairly warranted by the evidence, to show the jury how it might be reconciled in some parts, and the difficulty of doing so in others. Nothing but hypercriticism can find any error in this part of the charge.

The ninth assignment we understand to be abandoned.

Even if correctly reported, the omission of the element of pre-
meditation, in the first general description of murder of the
first degree, was immediately cured by the full, explicit, and
accurate definition given in connection with the facts of the
case in hand.

The eleventh to the twenty-third assignments may be taken
together and disposed of by saying that, so far as they were
correct and pertinent statements of the law, they were affirmed
in the charge. Points, even though taken verbatim from the
decisions of this court, cannot always properly be answered by
a simple affirmation. However accurately and carefully stated
in their connection and applied to the case under discussion,
they may, when taken as detached sentences and applied to
different circumstances, convey erroneous ideas, especially to
unlearned jurors. For example, the prisoner's fourth point
was that "Before the jury, in this case, can convict of murder
of the first degree, they must find that the prisoner acted upon
as clear and premeditated a motive as he who kills by poison
or by lying in wait." This is said to be taken from the lan-
guage of this court, though the case is not given, which is a
very unsatisfactory mode of citing authority. It may be there
are cases in which this would be a correct statement of the
law; but, separated from its context and applied to the present
case of shooting at a street corner, and answered by a simple
affirmation, it would be dangerously liable to convey to the
jury the idea that a prolonged premeditation, such as is neces-
sarily involved in killing by poison or lying in wait, was essen-
tial to the case they had in hand. The learned judge told the
jury that the design and the resolve to kill must be formed be-
fore the shot was fired; that no specific time was requisite to
make premeditation; the time might be short, but that short-
ness of time was an argument against premeditation; and that
the jury must be satisfied from the evidence that premeditation
and the deliberate intent were there, not merely when the shot
was fired, but were there previously. This was all the prisoner
was entitled to ask. He had no right to dictate the language
of the court. To convey the proper idea to the jury, language
often must vary with the circumstances of the particular case.
Neither under the act of March 31, 1860, or otherwise, has the
prisoner a right to have answers to his points in any set form.

Opinion Concurring.

The statute, § 58, provides that " it shall be the duty of the court to answer the same fully ; " and this is the measure, not only of the court's duty, but of the prisoner's right.   If the law applicable to his case is plainly, fully, and accurately stated, he has no cause of complaint, though the judge choose to express it in his own words.

There remains only the twenty-fourth assignment, that the judge erred in his answer to the point that " The jury are judges of the law as well as of the fact, and may, upon the whole case, determine the grade of the offence."   The learned judge answered this point by saying that the jury had been sworn to decide the case on the law and the evidence ; that the statement of the law by the court was the best evidence of the law within the jury's reach ; and that therefore, in view of that evidence and viewing it as evidence only, the jury was to be guided by what the court had said with reference to the law. This was an accurate and carefully considered answer to the point, and is entirely in harmony with Kane v. Commonwealth, 89 Pa. 522.   It left the jury to decide the whole case upon the law and the evidence,—not upon the law as distinct from the evidence ; and they were instructed as to what was the best evidence of the law.   That is to say, in the language of the constitution, they were to determine " the law and the facts, as in other cases," under the advice and direction of the court ; they were to look to the court for the best evidence of the law, just as they look to the witnesses for the best evidence of the facts. Thus interpreted and thus administered, this seeming paradox in our criminal law becomes intelligible.   A judge who instructs a jury, in a criminal case, that they may disregard the law as laid down by the court, errs as widely as the judge who gives them a binding instruction upon the law.   It is the duty of the jury to take the best evidence of the law, as it is to take the best evidence of the facts.   When they refuse to do either, they disregard their duty and their oaths.

> The judgment is affirmed, and it is ordered that the record be remitted to the Oyer and Terminer for the purpose of execution.

Mr. Justice Mitchell, concurring:

I concur in affirming this judgment and in the reasons given,

Opinion Concurring.

but upon one point I would go further, and put an end once for all to a doctrine that I regard as unsound in every point of view, historical, logical, or technical. The prisoner at the trial requested the judge to charge the jury that they were "judges of the law as well as of the fact." The learned judge, feeling himself bound by the language of Kane v. Commonwealth, 89 Pa. 522, answered that the jury had been sworn to decide the case on the law and the evidence; that the statement of the law by the court was the best evidence of the law within the jury's reach, and that therefore, in view of that evidence and viewing it as evidence only, the jury was to be guided by what the court had said with reference to the law. The point should in my opinion, have been answered with an unqualified negative. The jury are not judges of the law in any case, civil or criminal. Neither at common law, nor under the constitution of Pennsylvania, is the determination of the law any part of their duty or their right. The notion is of modern growth, and arises undoubtedly from a perversion of the history and results of the celebrated contest over the right to return a general verdict, especially in cases of libel, which ended in Fox's Bill, 32 Geo. III., c. 60.

In the early days of jury trials, issues that went to the country were usually simple, and were probably submitted to the jury without much separation of law and fact by the judge, and in that sense juries decided the law. But the distinction between questions of law and fact, and the tribunals for their decision respectively, lies at the foundation of our juridical system, and there was no time when it did not exist. The rule, ad questionem facti non respondent judices, ad questionem juris non respondent juratores, was an ancient maxim in the days of Coke: Coke Litt., 155 a; 8 Rep. 155 a; 9 Rep. 13 a; and Mr. Bigelow, treating of the class of cases raising questions of law, or some question of fact properly belonging to the court to decide, quotes the case of the Archbishop of Canterbury v. Abbot of Battel Abbey, 1 Rotul. 143, tempore Stephen, which "turned upon a question of law, and was decided (without appointment of a trial term) just as a modern case of the kind would be decided, by a submission of the point of law in the question to the determination of the court, and not to some test imposed by the parties:" Hist. of Procedure

in England during the Norman Period, by M. M. Bigelow,
p. 286. Nor was there any distinction in respect to the merely
incidental way in which juries passed upon matters of law, be-
tween civil and criminal cases. They might return a general
or a special verdict in either, but they early sought to escape
the obligation of giving a general verdict, because it subjected
them to the risk of an attaint; and Coke says, "Some justices
did rule over the recognitors to give a precise or direct verdict
without finding the special matter:" 2 Coke Inst., 422. To re-
lieve juries from this burden, the statute of Westminster 2d,
c. 30, enacted: "Quod Justiciarii ad assisas capiend' assignati,
non compellant juratores dicere præcise si sit disseisina vel
non, dummodo dicere voluerint veritatem facti, et petere aux-
ilium Justic.;" and, commenting upon this section, Coke says,
"In the end it hath been resolved that in all actions, real, per-
sonal and mixed, and upon all issues joined, general or special,
the jury might find the matter of fact pertinent, . . . . . and
thereupon pray the discretion of the court for the law; and
this the jurors might do at the common law, not only in cases
between party and party, whereof this Act putteth an example
of the Assise, but also in pleas of the crown:" 2 Coke Inst.,
425.

It is a striking illustration of the uniformity of human mo-
tives at·all periods, that, while the attaint remained as a rem-
edy for perversity or favoritism, the struggle of juries was to
escape the obligation of general verdicts and to maintain the
right of special findings of fact; but when the decline and
final disuse of the attaint rendered them practically irrespon-
sible, the struggle was reversed, and juries asserted stoutly the
right to give general verdicts, while the tendency of lawyers
and judges was to confine them to special findings of fact and
to have the court pronounce the result as a matter of law.
The period of transition was long and changes slow. It was
clearly and justly felt that juries, as judges of the law in any
but an incidental way, were an anomaly in the system, and
perhaps those who endeavored to do away with it claimed too
much. Safety was thought to reside in the retention by juries
of the right to give general verdicts. In view of the constant
and notorious failure of justice in certain classes of cases, by
the occasional perversity and the frequent cowardice of juries,

it may be doubted whether it would not have produced better results to have enlarged the power of judges to compel special verdicts.    But, however this may be, the right of juries to give general verdicts, especially in criminal cases, has been maintained, and the last contest made on it was in regard to libel.

The exact line between law and fact, not always easy to draw, presented in the case of libel some special difficulties, technical and other.    The alleged libel being in writing, its terms were not in dispute and naturally fell to the court to pass upon, as other writings did ; and the intent, libellous or otherwise, being claimed as a legal inference, there was nothing left in dispute but the fact of publication and the truth of the innuendo.    Accordingly, the juries in the Dean of St. Asaph's Case, and the King v. Withers, 3 Term R. 428, were confined to these two points; and it was to counteract these rulings of Buller and Mansfield and Kenyon, (though it cannot be disputed that they were in accordance with long settled practice,) and to secure, in libel as in other cases, the right of the jury to find a general verdict upon the whole matter in issue, that the act of 32 Geo. III., c. 60, was passed.    The text of that famous statute is worth quoting to show how little foundation it affords for the superstructure that is sought to be built upon it. It is entitled "An Act to remove Doubts respecting the Functions of Juries in Cases of Libel," and its language is :

"Whereas doubts have arisen whether on the trial of an indictment . . . . . for the making or publishing any Libel, where an issue is joined . . . . . on the plea of not guilty pleaded, it be competent to the jury empaneled to try the same to give their verdict upon the whole matter in issue : Be it therefore declared . . . . . that, on every such trial, the jury sworn to try the issue may give a general verdict of guilty or not guilty upon the whole matter put in issue upon such indictment or information, and shall not be required or directed, by the court or judge before whom such indictment or information shall be tried, to find the defendant or defendants guilty, merely on the proof of the publication by such defendant or defendants of the paper charged to be a Libel, and of the sense ascribed to the same in such indictment or information.

"Provided always, that, on every such trial, the court or judge before whom such indictment or information shall be

Opinion Concurring.

tried, shall, according to their or his discretion, give their or his opinion and directions to the jury on the matter in issue between the King and the defendant or defendants, in like manner as in other criminal cases.

" Provided also, that nothing herein contained shall extend, or be construed to extend, to prevent the jury from finding a special verdict, in their discretion, as in other criminal cases.

" Provided also, that in case the jury shall find the defendant or defendants guilty, it shall and may be lawful for the said defendant or defendants to move in arrest of judgment, on such ground and in such manner as by law he or they might have done before the passing of this act; anything herein contained to the contrary notwithstanding."

Nothing could be clearer than the care with which this act was directed to the exact point in controversy, the right to render a general verdict of guilty or not guilty upon the whole issue, in cases of libel, and the equal care with which the right of the court to pass finally upon the questions of law, was preserved by the provisos that the judge should give the jury his " opinion and directions," and that a verdict should still not be conclusive of the law against a defendant, but he should have his right to an arrest of judgment as theretofore enjoyed. The claim that juries were to be judges of the law was thus intentionally and carefully excluded.

The constitution of Pennsylvania was made in 1790, two years before Fox's Libel Act. The controversy was then at its height, and the subject commanded popular attention. In fact, Pennsylvania had borne rather a distinguished part in the discussion, and the speech of Andrew Hamilton, in the trial of John Peter Zenger, was regarded as the vindication of popular rights, and not only quoted as such by Erskine but referred to among other authorities by Hargrave: Coke Litt., 155 b. "No lawyer," says Mr. Binney, "can read that argument without perceiving that, while it was a spirited and vigorous, though rather overbearing harangue, which carried the jury away from the instruction of the court, and from the established law of both the colony and the mother country, he argued elaborately what was not law anywhere, with the same confidence as he did the better points of his case. It is, however, worth remembering, and to his honor, that he was half a century before

Mr. Erskine, and the declaratory act of Mr. Fox, in asserting the right of the jury to give a general verdict in libel as much as in murder:" Leaders of the Old Bar of Philadelphia, p. 15.

The members of our convention of 1790 were familiar with the subject, and the minutes show that much care was given to framing the clause in the declaration of rights which refers to it. Section seven of article IX., relating to liberty of the press, was originally reported to the convention by the committee to draft a proposed constitution, on December 21, 1789, in the following form: " That the printing presses shall be free to every person who undertakes to examine the proceedings of the legislature, or any branch of government, and no law shall ever be made restraining the right thereof. The free communication of thoughts and opinions is one of the most invaluable rights of man, and every citizen may freely speak, write and print, being responsible for the abuse of that liberty:" Proceedings of the Convention, p. 162, Harrisburg, 1825. This was reported from committee of the whole, on February 5, 1790, in the same form (dropping only the word "most" before the word "invaluable"), but with the addition: "But upon indictments for the publication of papers investigating the conduct of individuals in their public capacity, or of those applying or canvassing for office, the truth of the facts may be given in evidence in justification upon the general issue:" Idem, 174. On February 22d, this section being under consideration, Mr. Addison offered, as a substitute for the sentence last quoted, "In prosecutions for libels, their truth or design may be given in evidence on the general issue, and their nature and tendency, whether proper for public information or only for private ridicule or malice, be determined by the jury." To this an amendment, offered by Mr. McKean, to add "under the directions of the court as in other cases" was adopted almost unanimously, the vote being fifty-six to three, but the substitute itself received a bare majority, thirty-two to twenty-seven; the strong minority being in favor of restricting the truth as a justification, to cases of publications upon the conduct of persons in their public capacity, or of candidates for office: Idem, 220–222. The convention, having ordered the proposed constitution to be published for the consideration of the citizens, adjourned on February 26th to the following Au-

Opinion Concurring.

gust.   On re-convening, the instrument was again taken up for
discussion, section by section, and the minority made strenuous
further efforts to restrict the justification to cases of public
officers, at one time failing only by the close vote of thirty to
thirty-two.   During the progress of the debate, an amendment
offered by Mr Lewis and seconded by Mr. McKean, that " the
jury shall have the same right to determine the law and the
fact, under the direction of the court as in other cases," was
carried, and the clause finally adopted in the form, " In prose-
cutions for the publication of papers, investigating the official
conduct of officers, or men in a public capacity, or where the
matter published is necessary or proper for public information,
the truth thereof may be given in evidence ; and, in all indict-
ments for libels, the jury shall have a right to determine the
law and the facts, under the direction of the court, as in other
cases : " Idem, 274–279.

It is impossible to read these various steps in the formulation
of our fundamental law, without seeing that there was never
at any time the intention to make or to consider juries as in
any sense judges of the law.   No such possible construction
seems to have been apprehended until suggested by McKean,
and the practically unanimous vote on his motion to add "un-
der the direction of the court as in other cases," shows the
feeling of the convention on this subject.   McKean was at
that time one of the foremost personages of the commonwealth,
perhaps its best trained lawyer.   He had studied in the Tem-
ple, and was familiar with the details of the legal controversy
between Buller and Mansfield, on the one side, and Erskine,
on the other, before Fox took it up as a matter of politics ;
and he knew, as Lewis and Wilson and Ross and Sitgreaves
and Addison and Findley and other leaders of the convention
knew, that the contest was not for any control by the jury as
judges of the law,—even Junius hardly ventured to put his
denunciations of Mansfield in that form,—but for the right of
applying the law to the facts and pronouncing the result by a
general verdict.   And such was the understanding of the con-
vention, as it was of parliament two years later, and such the
natural meaning of the language on which they finally settled
to express their purpose.   It puts beyond question the right
to return a general verdict, nothing more.   To cut the sentence

in two, and say the jury are "to determine the law," is not only to pervert the meaning, but to nullify the other command that they are to determine " under the direction of the court." What they are to determine is, " the law and the facts as in other cases," that is, the law as given to them by the court, and the facts as shown by the evidence. They are bound to take the law from the court; but, so taking it, they have the right to apply it to the facts as they may find them to be proved, and to announce the result of the whole, by a general verdict of guilty or not guilty. Any other construction would be totally at variance with the fundamental principles of our system of jurisprudence and with our settled and uncontested practice. It has never been claimed that the jury are to determine what evidence is admissible, or what witnesses competent; yet, if they are judges of the law, they should decide these often most important law points in a case. So as to the sufficiency of an indictment. Again; the jury have a right to return a special verdict even in a criminal case : Dowman's Case, 9 Rep. 12 b.; 2 Coke Inst., 425 ; Hargrave's note to Coke Litt., 155 b. It is admitted that they must decide the facts, and if they are judges of the law then it is their duty to decide it, and they cannot transfer that duty to the court. The prisoner might demand his right that they should exercise their full functions; but all the authorities are to the contrary, and if the finding of facts can be separated from the conclusion of law, the latter will be decided by the judges by their own views. " When a jury find the matter committed to their charge at large, and further conclude against law, the verdict is good and the conclusion ill : " Heydon's Case, 4 Rep. 42 b. " The office of twelve men is no other than to inquire of matters of fact, and not to adjudge what the law is, for that is the office of the court and not of the jury ; and if they find the matter of fact at large and further say that thereupon the law is so, where in truth the law is not so, the judges shall adjudge according to the matter of fact, and not according to the conclusion of the jury : " Townsend's Case, Plowden, 114 b. And see 2 Hale, Pleas of the Crown, 302 ; 1 Chitty, Crim. Law, 645.

Much misunderstanding has in my judgment been caused in this state by the case of Kane v. Commonwealth, 89 Pa. 522.

Opinion Concurring.

In that case, the point was put to the court below that "the jury are the judges of the law and the fact," and all that this court decided was that the point should have been affirmed. The language of Chief Justice SHARSWOOD was, however, less guarded than was usual with that eminent jurist; and, following State v. Croteau, 23 Vt. 14, he dismisses the perfectly clear and substantial distinction between power and right with a brevity that is scarcely consistent with the weight of the subject. "The distinction between power and right," he says, "whatever may be its value in ethics, in law is very shadowy and unsubstantial. He who has legal power to do anything has the legal right. No court should give a binding instruction to a jury which they are powerless to enforce by granting a new trial if it should be disregarded." It is somewhat remarkable that the Chief Justice should assume, as is so commonly done by counsel, that the jury will construe the law more favorably for the prisoner than the court would. It is only such a construction, too favorable to the prisoner, that the court is powerless to remedy by a new trial; and that lack of power arises, not because the jury's legal power is the same as a legal right, but because, for reasons of general policy, one verdict of acquittal is a final and irreversible termination of the case. If legal power means legal right, then a jury has a right to acquit any prisoner without regard to either law or evidence; for their power to do so is beyond question, and they cannot be held to any accountability though they follow the maxim of Lynch law, that the murdered man deserved to die anyhow, and therefore his murderer should not be punished, even though he no longer seeks refuge behind the thin veil of transitory insanity that began when the shot was fired and ended when it had killed its man. Whether the distinction between power and right be shadowy and unsubstantial in practice, or not, it is clear and vital, and I must repudiate such a confusion of logical as well as moral ideas. A jury may disregard the evidence, but no judge has ever said it had the legal right to do so; and if the disregard is of the weight of the evidence favorable to the prisoner, the court sets aside the verdict without hesitation; and even this court, though it does not pass upon the weight of evidence, does examine its sufficiency and may on that ground reverse without a new venire. Commonwealth v.

Fleming, 130 Pa. 163; Commonwealth v. Knarr, 135 Pa. 47; Commonwealth v. Railroad Co., 135 Pa. 256; Commonwealth v. Brown, 138 Pa. 452; Commonwealth v. Ruddle, 142 Pa. 144, are a few recent instances of the exercise of this power.

So, the jury may disregard the law favorable to the prisoner. As was suggested by the learned judge at the trial of the case in hand, the jury had the legal power to find murder of the first degree without regard to the element of premeditation, but no judge would contend that they had the legal right to do so; and, if the evidence of premeditation was below the legal standard, determined by the court as matter of law, not only would the trial court set aside the verdict, but this court would be bound to review the evidence and determine if the legal elements of murder of the first degree existed in the case. Such powers and such duties in the courts are absolutely inconsistent with the right of the jury to be in any sense judges of the law.

This is not new doctrine, but the long-established law of the state. Alexander Addison was one of the staunchest asserters of the rights of juries in the constitutional convention, and was one of the minority of three who voted against McKean's amendment to insert the words " under the direction of the court as in other cases; " but when, three years later, he presided in the Oyer and Terminer of Washington county, he laid down the law in these precise and forcible terms : " Whether the facts are so or so, it lies with you to determine, according as you believe the testimony. Supposing them so or so, whether they amount to murder or manslaughter, is a question of law for the court to determine. You may find, according as you believe or disbelieve the facts, and comparing the facts with the rules of law, that the prisoner is guilty or not guilty (of murder), or guilty of manslaughter; or, you may find the facts specially, without drawing any conclusion of guilt or innocence, leaving it to the court to pronounce the construction which the law puts on the facts found; but you cannot but at the peril of violation of duty, believing the facts, say that they are not what the law declares them to be; for this would be taking upon you to make the law, which is the province of the legislature, or to construe the law, which is the province of the court: " Pennsylvania v. Bell, Add., 160. And in Commonwealth v. Sherry, an indictment for murder growing out of the

Opinion Concurring.

riots of 1844, removed by certiorari from the Quarter Sessions of Philadelphia and tried in the Nisi Prius in April, 1845, Justice ROGERS charged the jury as follows: "You are, it is true, judges in a criminal case in one sense of both law and fact; for your verdict as in civil cases, must pass on law and fact together. If you acquit, you interpose a final bar to a second prosecution. . . . . The popular impression is that this power . . . . arises from a right on the jury's part to decide the law as well as the facts, according to their own sense of right. But it arises from no such thing. It rests upon a fundamental principle of the common law that no man can twice be put in jeopardy for the same offence. . . . . It is important for you to keep this distinction in mind, remembering that, while you have the physical power by an acquittal to discharge a defendant from further prosecution, you have no moral power to do so against the law laid down by the court. The sanctity of your conclusions, in case of an acquittal, arises, not from any inherent dominion on your part over the law, but from the principle that no man shall be twice put in jeopardy for the same offence, a principle that attaches equal sanctity to an acquittal produced by a blunder of the clerk, or an error of the attorney general. . . . . You will see, from these considerations, the great importance of the preservation, in criminal as well as in civil cases, of the maxim that the law belongs to the court, and the facts to the jury. My duty is therefore to charge you, that while you will in this case form your own judgment of the facts, you will receive the law as it is given to you by the court:" Wharton on Homicide, App., 721. To the same effect, though less explicitly developed, are the rulings by SERGEANT, J., of this court, in Commonwealth v. Van Sickle, Brightly, 73; and by GIBSON, C. J., in Commonwealth v. Harman, 4 Pa. 269. And this also seems to have been the later and better considered opinion of Judge BALDWIN whose charge in United States v. Wilson, Bald. 99, is commonly quoted as authority on the other side. See his charge in United States v. Shive, Bald. 512. I do not understand that the case of Kane v. Commonwealth was intended to overrule or conflict with these decisions; and, notwithstanding the latitude of the language of the opinion, the real point decided did not go beyond the affirmation of the right to an instruction that " the jury are

the judges of the law and the fact." In the present case, it will be observed that the instruction asked was that the jury are "judges of the law *as well as* of the fact," that is, of each, not merely of the joint result of both. For myself, I think even the formula that the jury are judges of the law and the fact, objectionable, as tending to convey to the jury a wrong idea. The language of the constitution is that the jury shall have the right to determine the law and the facts, under the direction of the court. This is the accurate formula, and it means only that they have the right to determine the joint result of the law and the facts by a general verdict. This is the form which ought to be used when instruction on the subject is asked, and it ought to be accompanied by explicit instruction that the jury are not judges of the law, in all cases where there is any apparent danger that the jury will arrogate to themselves such function.

My conclusions on the general subject, therefore, are:

1. That the jury never were judges of the law in any case, civil or criminal, except incidentally as involved in the mixed determination of law and fact by a general verdict.

2. Even if it could be conceded that they may have been so in primitive times, their right certainly ceased after the introduction of bills of exception and the granting of new trials, and admittedly has not existed in civil cases for centuries.

3. That there was not originally, nor is now, any distinction in this respect between civil and criminal cases, the true rule as to both being that "the immediate and direct right of deciding upon questions of law is entrusted to the judges; in a jury, it is only incidental:" Hargrave's note to Coke Litt., 155 b. The idea of a difference in the rights and functions of juries in civil and criminal cases, as to the determination of the law, arose from a misconception of the controversy over the right to give a general verdict, and was an error for which there is no respectable English authority, and which the best American authorities have overwhelmingly disapproved.

4. That, even if the jury had originally had such right in criminal cases, it was an anomaly, belonging to the period when jurors were selected from the vicinage, because of their knowledge of the case, and, like its congener, has changed and disappeared, because totally inconsistent with the functions of courts

Opinion Concurring.

and juries as now understood, with sound reason and with common sense. And such change, if change it be, has the sanction of the constitutional provision that the jury shall determine " under the direction of the court," of the legislative provisions for bills of exception, the review of the evidence in cases of murder, etc., etc., and of the long-settled and incontestable power of courts to decide questions of evidence, to set aside verdicts and grant new trials, without limit except when controlled by the ancient maxim of the common law, embodied in our constitutional declaration of rights, that no man shall be twice vexed for the same offence.

This whole subject is discussed with exhaustive learning and ability in State v. Croteau, 23 Vt. 14. The opinion of the court by HALL, J., is the only serious attempt that I have been able to find, to support the dogma for which it is now mainly responsible, and with great respect for that eminent jurist it appears to me that his whole argument is based on the confusion of the right to determine the law with the right to render a general verdict. A careful examination of all the authorities cited by him, and they include everything which the most learned and diligent research could discover, shows that they only go so far as to sustain the right of the jury, not to be judges of or to determine the law, but only to *apply* it through a general verdict. The dissenting opinion of BENNETT, J., in the same case, displays equal learning and sounder reasoning. It is a storehouse of information on the subject, and has anticipated everything that can be said upon it. A masterly analysis and review by Chief Justice SHAW will also be found in Commonwealth v. Anthes, 5 Gray 185. There are less elaborate but equally clear and forcible statements of the argument by STORY, J., in United States v. Battiste, 2 Sumn. 240; by B. R. CURTIS, J., in United States v. Morris, 1 Curt. C. C. 23, 49; by GILCHRIST, J., in Pierce v. State, 13 N. H. 536; and by SHAW, C. J., in Commonwealth v. Porter, 10 Metc. (Mass.) 263. See, also, Montgomery v. State, 11 Ohio 427; Montee v. Commonwealth, 3 Marsh., J. J., 149; Townsend v. State, 2 Blackf. 151 (but see Armstrong v. State, 4 Blackf. 247); Pierson v. State, 12 Ala. 153; Hardy v. State, 7 Mo. 607; Nels v. State, 2 Tex. 280; Brown v. Commonwealth, 10 Southeast. R. 745 (Ct. of App. of Va., 1890); a very able

and compendious statement of the controversy in England, while still raging before the passage of the libel act, by Mr. Hargrave in his note to Coke Litt., 155 b; an article by C. J. Wade of Montana in 3 Crim. Law. Mag., 484; and one by the late Dr. Francis Wharton in 5 South. Law Rev., N. S., 352 (reprinted in 36 Leg. Int., 405, and 1 Crim. Law Mag., 47); 7 Dane's Abr., 381–3; 2 Boston Law R., 187; 15 Idem, 1; and 13 Am. Law Reg., N. S., 355.

As already said, there is not a single respectable English authority for the doctrine in question; and against the foregoing solid phalanx of the best American judicial and professional opinion, I have not been able to find a single well-considered case except State v. Croteau, which as already seen was by a divided court. Under these circumstances, whether the doctrine be of much practical importance or not, I cannot help thinking it a matter of regret that any vestige of it should be left in Pennsylvania.